# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

**FILED**

**AUG 2 5 2005**

James H. Clark
*Alternative Discipline Behavior Concept*
*(ADBC)*

Plaintiff,

**4:05CV0134** DISTRICT COURT

Case No:_____

- vs. -

Floyd Crues
Steven Warmack
Larry Hutchins
Shane Hopper
Silvia Shead
Mel Gunther
Richard Bates
St. Louis Public School District (SLPS)
SLPS Board of Education (former)
    Darnetta Clinkscale
    Vincent Schoemehl
    Amy Hilgerman
    Robert Jackson
    Ron Archibald
    Bill Hass
    Veronica O'Brian
Robert Lee
    School Service Systems (SSS)
Alternative Unlimited Inc.
Ken Brostrum

Defendants,

Honorable Judge_____

Division:_____

*Jury Trial Demanded*

## VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER FORMS OF RELIEF

This MATTER NOW COMES before the United States District Court, Eastern District of

Missouri, by Plaintiff; JAMES H. CLARK, and with no alternative other than representing

himself **"pro se"** against the Defendants.

## The Parties

**PLAINTIFFS**

1. Plaintiff **JAMES H. CLARK**, and by representing himself "pro se," is a former employee of the St. Louis Public School District, and **shall be referred to as Plaintiff.**

2. **Alternative Discipline and Behavioral Concepts, L.L.C.,** is an Behavioral Consultant entity established by Plaintiff Clark to provide; but not limited to, Alternative Discipline and Behavioral Concepts to school districts and/or schools, and is registered legally to do Business in the State of Missouri, and shall be **referred to as ADBC** throughout this Complaint.

**DEFENDANTS**

3. Defendants all share in common a relationship with the **St. Louis Public Schools**. The St. Louis Public Schools shall be **referred to as the SLPS** throughout this Complaint.

4. **Mr. Floyd Crues**, who shall be **referred to as Crues**, was the Superintendent of SLPS from; June of 2004, through mid November of 2004.

5. **Mr. Steven Warmack**, who shall be **referred to as Warmack**, was the principal of Roosevelt High School during the 2003-04 school year, and became the Assistant Superintendent of High Schools for the SLPS during the summer of 2004 and throughout the 2004-05 school year.

6. **Dr. Larry Hutchins**, who will be **referred to as Hutchins**, was a TOP supervisory administrative official in the SLPS until June of 2004.

7. **Mr. Mel Gunther**, was the assistant principal at Roosevelt during the 2003-04 school year and was the Plaintiff's indirect supervisor. During the 2004-05 school year, Gunther was the administrator in charge of the disciplinarians and the in-school suspension personal at Roosevelt H.S., and **shall be referred to as Gunther.**

**8. Mrs. Silvia Shead** was the assistant principal at Roosevelt H.S. under Warmack during the 2003-04 school year. She became the head principal at Roosevelt during the 2004-05 school year and shall be **referred to as Shead** in this complaint.

**9. Dr. Shane Hopper** was a teacher at Roosevelt H.S., during the 2003-04 school year. Hopper became an assistant principal at Roosevelt, during the 2004-05 school year. Hopper became a "former" SLPS employee in March of 2005 (upon the end of the 2004-05 school year) and shall be **referred to as Hopper.**

**10. Former SLPS Board of Education members** consists of; Mrs. Darnnetta Clinkscale, the Honorable Vincent Schoemehl, Mrs. Amy Hilgemann, Mr. Robert Jackson, Mr. Ron Archibald, Mrs. Veronica O'Brian, and Mr. Bill Hass. They will be referenced as the **Former Board of Education members,** since they were all SLPS Board members prior to the April election of 2005.

**11. Mr. Robert Lee,** personal friend of Crues and Warmack, **will be referred to as Lee**.

**12. School Service Systems, L.L.C.,** which shall be **referred to as SSS,** was/is an illegally organized foreign company established by Defendant Robert Lee

**13. Alternative Unlimited Inc,** a State of Maryland corporation and an Educational service provider, and **will be referred to as AU.**

**14. Mr. Ken Brostrum,** is an attorney and employed by the Law Firm recognized as; Lashly & Baer P. C.and **shall be referred to as Brostrum**.

15. Omitted

16. Omitted

17. Omitted

## Jurisdiction and Venue

18(a). This Court has original jurisdiction over all defendants pursuant to 28 U.S.C. S 1332, as the case involves a claim in that exceeds $50,000.00 between citizens of different states.

18(b). Corporate Defendants SSS, AU, and the SLPS each have and/or are currently conducting business in the City of St. Louis, which is located in this courts district.

19. Venue for this action is proper before this Court pursuant to the provisions of 28 U.S.C. S 1343.

20. Venue for this action is proper before this Court pursuant to the provisions of 28 U.S.C. S 1338, as this case involves Patent, Copyright, and Unfair Competition issues.

21. A substantial portion of the events and omissions giving rise to the claims and Causes for Action in this Complaint occurred and are still occurring within this judicial district.

22. Venue for this action is proper before this Court pursuant to the provision of 28 U.S.C. S 1343, as this case involves deprivation of the Plaintiff's Civil Rights, Damages to the Plaintiffs property, and numerous Conspiratorial Acts done to furtherance the Defendants advantages.

## Background Facts
## Common to Parties and Causes of Action

25. Factual Events Common to Parties starts with sentence 25.

26. Plaintiff, was employed by Special School District (SSD) of St. Louis County for approximately 11 years at Dielman and Northview Schools, which were both self-contained SSD school buildings that housed severe behavior and emotionally disturbed (BD/ED)student populations.

27. Referencing sentence 26, Plaintiff was as the crises intervention teacher. His job expectations were; but not limited to, intervene with teachers, administrators, bus drivers, security personal, parents/guardians, counselors, psychologists, along with students; who were exhibiting disruptive, disrespectful, violent, threatening, dangerous, and/or other inappropriate behaviors that were interfering with the educational process.

28. While employed by SSD, Plaintiff became highly recognized and admired for his communication skills, patience, understanding, consistencies, and his behavioral modification strategies, which were necessary to accommodate; the classroom teachers, keeping the parents involved, minimize administration headaches, while containing the severe BD/ED students that the classroom teachers couldn't or didn't want in their classrooms. The Plaintiff was employed by SSD in the fall of 1990 and he resigned from SSD in June of 2001. The Plaintiff was recognized with the following achievements while employed by SSD:

    a. **Teacher of the Month** in April of 1995.

    b. **Teacher of the Year** in 1996, incongruence with the **Emerson Electric Teaching in Excellence** award during the same school year.

29(a). In 1994, the Plaintiff was diagnosed with an Attention Deficit Disorder (ADD). Upon his ADD diagnoses, he was prescribed and began taking medication accordingly. Many BD/ED students have an ADD disorder.

29(b). The Plaintiff has been advised that his ADD, incongruence with an Intellectual Quotient (IQ) above that of an genius level comparison, which is an asset and contributes to his success at communicating with BD/ED student populations, his employment peers, and others.

30(a). The Plaintiff also has approximately five (5) years of employment experiences, primarily part time, weekend, and during the summers from 1994 through 1998, in state and privately operated residential placements, psychiatric wards, and institutions designated to therapeutically education children, youth, and adults with severe behavioral and emotionally disturbances.

30(b). On medication, the Plaintiff enrolled in graduate school in the fall of 1995 and by the summer of 1997, acquired a Masters Degree, from the University of Missouri at St. Louis (UMSL) in education Administration.

31(a). From June of 2001 through the summer of 2003, the Plaintiff was employed as the Executive Director of Camp Crystal Foundation, which was a non-profit organization established to provide supportive living, employment and educational opportunities for individuals with special needs.

31(b). With a change in the states economics and other issues, Camp Crystal Foundation didn't accomplish its goals, therefore, the Plaintiff decided to get back into teaching, therefore, he apply and acquired a teaching position with the SLPS.

32(a). Plaintiff was interviewed by Defendant Warmack, who was amazed at the Plaintiff's previous teaching experiences with SSD, and he began his employment with the SLPS in October of 2003.

32(b). The Plaintiff was assigned to work at Roosevelt's 9th Grade Center, which was recognized as part of Roosevelt High School, but located in a separate building a few miles away.

33. Plaintiff was employed as a special education resource teacher and assigned to work in an algebra classroom and a physical science classroom.

34. Upon the interview with Warmack, the Plaintiff was under the impression that he would be employed as a disciplinarian and/or in one of the numerous in-school suspension (ISS) rooms. Since the Plaintiff's teaching history has been strictly limited to a time-out room, operating an ISS room at a regular high school would be beneficial for both the Plaintiff and the school location of his employment.

35. There is a significant difference between a; special education "resource teacher," which is often associated with or referred to as a class within a class (CWC) assignment, and a "self-contained" special education teacher.

74. The first Court hearing of Case No: 4:04CV01904-SNL, which is Alternative

Unlimited Inc. vs. Robert Lee and School Service Systems, L.L.C., was on January 3rd 2005.

    a. The Plaintiff sat in on the hearing and listened to all of the attorneys fight over his proposal.

    b. Upon his return to Roosevelt H.S., the write-ups were waiting and the harassment – retaliation against the Plaintiff dramatically escalated.

    c. At the hearing, there were two newspaper writers (Post Dispatch and the Argus) who anxiously approached the Plaintiff during the first recess.

    d. The Plaintiff answered all of their questions with factual documentations illustrating that he was the creator of the referenced trade secrets.

    e. The Post Dispatch and the Argus wrote stories about the hearing and referenced the Plaintiff as an anonymous SLPS teacher.

    f. The Plaintiff produced correspondences with Defendants Warmack and Crues, which didn't make either of them, look good.

75. As of August 17th 2005, approximately 250 pages of documents have accumulated

referencing Alternative Unlimited Inc. vs. Robert Lee & SSS and their Law Suit. A trial date has been set for October 4th 2005.

76. The Plaintiff has spent the most of the 2005 summer contacting and attempting to

acquire an employment position within a local school district in or surrounding the St. Louis

metropolitan area with an objective of implementing his programmatic services.

77. As of August 24th 2005, the Plaintiff has had no luck acquiring an employment

position.

78. Since the Plaintiff was non-retained by the SLPS, he should qualify for unemployed

benefits through the division of employment securities, until he acquires employment.

79. The division of employment security has indicated in their correspondences that the

SLPS has assured them that the Plaintiff will be employed during the 2005-06 school year, and

that teachers doesn't qualify for unemployment benefits during their summer breaks.

80. Therefore, as a result of the Defendants continuous Defaming, humiliating, and

intentional inappropriate actions targeting the Plaintiff, the Plaintiff is taking the following

Causes of Action.

70. On December 29th 2004, an article entitled "Schools firm sues ex-worker," was

printed in the Post Dispatch and became the key and answer to many issues and questions.

71. According to the article, Defendant Lee had acquired a $700,000.00 SLPS Board

approved contractual agreement to implement the Plaintiff's program.

72. According to the article, Lee acquired the $700,000.00 agreement with the SLPS

while he was employed, and/or throughout his contractually altered employment period with

Alternative Unlimited (AU).

    a. Lee had been conspiring with Crues, Warmack, and a few of the former
SLPS Board members since January of 2004, with an objective of stealing
the Plaintiff's program.

    b. This explains why the former SLPS Board approved to Adopt a new Policy,
which was secretly accomplished and to this date is unpublished.

    c. Adopted Policy P3325.5 says the SLPS can't purchase services from a
former SLPS employee for two (2) years.

    d. The Defendants knew the Plaintiff's program was going to be worth a lot of
money even after the Plaintiff had spent only two (2) weeks preparing for it.

    e. Lee had already set up his departure from AU anticipating the acquirement of
$700,000.00 to implement the Plaintiff's program, while he was still
employed by AU.

    f. Referencing previous sentences, Lee established SSS on August 16th 2004,
immediately after Defendant Crues acquired a copy of the Plaintiff's
program. SSS was established and organized illegally by Lee.

    g. Plaintiff alleged on and after December 29th 2004 that AU didn't file suit
against Lee for the $700,000.00, most importantly; AU wanted the Plaintiffs
program, and then any compensation resulting there from secondly.

    h. Since it had become public knowledge that School Service Systems, L.L.C.,
had been organized illegally, for whatever reasons, the SLPS secretly
approved to allow AU to acquire, and implement the Plaintiffs program in
February or March of 2004.

    i. The former SLPS Board of Education, behind closed doors and in a very
private meeting, approved to compensate AU $2,100,000.00 to implement
the Plaintiffs program.

73. Meanwhile AU has been sued and is currently still being sued by numerous private

schools throughout the City of St. Louis for; but not limited to, "Breach of Contract."

   b. A direct dereliction of employment duties, were cited as the Cause when the
      Plaintiff did what he was instructed to do from other SLPS officials,

   c. The Plaintiff realized at this time, incongruence with his assigned
      employment expectations, that he was not wanted at Roosevelt H.S.

67. Upon showing Burke a copy of his "Out of Area" program, Burke immediately

responded by saying, "Hey, your program is just like the one the district plans on strategically

marketing throughout the nation and making millions of dollars off of from other school

districts."

   a. On or within a close proximity of the 14th of September 2004, the Plaintiff
      joined the Local 420 Teachers Union, which turns out to have not been in the
      Plaintiffs best interest,

   b. Local 420 Union officials (Burke, Mary Armstrong, Diane Rome, and their
      legal counsel) watched the SLPS; but not limited to:

         i. Assigned him unrealistic employment expectations along with
            jeopardizing the educational process of the Plaintiffs students.

        ii. Taking the Plaintiff's behavioral program and without consulting
            him, providing an unqualified and illegally registered company with
            it, along with a SLPD Board approved contractual agreement to
            implement, even though numerous Defendants had told the Plaintiff
            he would be compensated to implement his program.

   c. Burke repeatedly told the Plaintiff that he needed to get an attorney and seek
      legal counsel, and that the 420 Union attorneys would do him no good.

   d. President Mary Armstrong, and Mrs. Rome told the Plaintiff that he needed
      to speak with the 420 Union attorneys.

   e. When the Plaintiff finally met with the 420 Union attorneys, he was
      instructed to file all of his grievances with 420 Union officials accordingly.

68. The Plaintiff's job expectations, schedule, resources, and lack thereof are thoroughly

reviewed in the referenced Causes for Action of this Complaint.

69. During the 2004-05 school year, the SLPS isolated and intentionally supplied the

Plaintiff with no SLPS literature, correspondences, and/or acknowledgements of future events.

The only means of acquiring information referencing the SLPS was through corresponding with

his teaching peers and the newspapers.

64. Referencing the letter in sentence 63, the Plaintiff acquired a certified copy of the exact same non-retention letter at 11:37 a.m., via certified and hand delivered by SLPS safety officer Winthrop Boykin at Roosevelt High School on April 15th 2005, which was humiliating and dehumanizing since this incident was acknowledged over Roosevelt's intercom.

65(a). The Defendants assigned the Plaintiff to the most unaccommodating and teaching position. Not even a twisted and deranged person could have put together a teaching assignment in "good faith" as the assignment acquired by the Plaintiff from Roosevelt's administration and forced to remain throughout the entire 2004-05 school year at Roosevelt.

65(b). The Plaintiff requested a transfer to any other school location for the 4th quarter in his correspondence dated March 7th 2004, which also referenced his resignation upon the conclusion of the 2004-05 school year from the SLPS.

65©. This was acknowledged to Roosevelt's administration through a Notification of Employee Separation dated March 23rd 2005, which also informs Roosevelt's administration to adapt the operating budget accordingly and filling the Plaintiff's position for the 2005-06 school year with a non-certified personal.

65(d). Since the Roosevelt's administration was notified of the Plaintiff's Separation in March of 2005, how and/or why did the current SLPS Board of Education approve to terminate the Plaintiff's contract based on administrations recommendation even though the Plaintiff had attempted to resign through his correspondence dated March 7th 2005?

66. Upon the Plaintiffs 1st week of employment at Roosevelt H.S., which was September 7th through the 10th 2004, the Plaintiff met with Mr. Burke who was the Local 420 Teachers Union representative at Roosevelt and sought help as a proximate result; not only the Plaintiff's employment expectations, but, because of two (2) write ups from Defendant Hopper threatening him with a potential termination that he acquired during his 1st week of employment at Roosevelt.

  a. Both threatening write-ups were totally unwarranted,

56(b). Since they forced the Plaintiff to sign a 2004-05 SLPS employment contract, and they repeatedly indicated to him that he would be employed and compensated to implement his program, how were they going to fool and/or get rid of the Plaintiff without him catching on to their Conspiracy along with the fact that they had been negotiating with Defendant Lee since January of 2004 for him to implement the his program?

57. As a result of the Plaintiffs program, Defendants; Crues, Warmack, Shead, and Hopper, and numerous other SLPS officials acquired advantageous promotions, prestigious advances, and unlawful compensation incentives during the summer of 2004, which were supposedly designed to extend throughout the 2004-05 school year.

58. The Defendants intentionally assigned the Plaintiff to unaccommodating employment positions throughout the entire 2004-05 school year.

59. The Plaintiff was severally and repeatedly harassed throughout the entire 2004-05 school year by SLPS officials (the Defendants), while he was employed as a special education self-contained cross-categorical science teacher.

60. The Plaintiff was repeatedly retaliated against, not only when he offered Roosevelt's administration assistance to help minimize the unbearable student discipline problems, but also when he contacted and/or requested accommodations to Roosevelt's administration and Human Resource officials.

61. The Plaintiff was not informed of most after school meetings and then acquired consequences for not attending them.

62. The Plaintiff acquired no informational correspondences in his teacher's mailbox at Roosevelt H.S. that other teachers acquired.

63. To the filing date of this Complaint, the Plaintiff has not acquired one correspondence from the SLPS at his home residence other than a certified non-retention letter on April 16th 2005 informing him that his employment with the SLPS would be terminated at the end of the 2004-05 school year, which was June 13th 2005.

51(a). No person, educational service provider, publisher, college professor, or any other Reputable entity has the solution as to solving the Public School Discipline problems other than the Plaintiff, which he proved through implementing his program.

51(b). The SLPS was desperate for the Plaintiff to release additional programmatic information so they could be the first district to implement, therefore minimizing and containing disruptive and disrespectful student behaviors.

52(a). In July of 2004, a newspaper article from the Post illustrated that Mr. Crues, the new SLPS Superintendent was given six (6) goals and he would receive a compensation bonus of $7,000.00 for each of the goals he acquired.

52(b). The 4th goal on his list was to initiate a piloted in-school suspension and alternative referral program, which was the Plaintiff's "Out of Area" program.

53(a). The Plaintiff finally had proof that the SLPS was going to utilize his program.

53(b). Upon the advise from several friends and legal counsel, the Plaintiff re-wrote the entire program professionally and acknowledged on every page his Copyright protected program, which he then gave a copy of to Mr. Crues on August 11th 2004.

54. Upon Mr. Crues acquiring what he wanted, Defendant Lee, a close personal friend of Crues, illegally acquired a license to conduct business in Missouri, even before he organized and established SSS legally in the State of Illinois, to operate in Missouri on August 16th 2004.

55(a). Now that Crues, Warmack, Hutchins, Lee, and other SLPS officials to include numerous middle school administrators, finally had acquired what they wanted from the Plaintiff.

55(b). The Plaintiff gave Crues a Copyright acknowledgement of most "Out of Area" documents to include the original hand written "Out of Area" program correspondences from Roosevelt's 9th Grade Center.

56(a). What was the SLPS going to do with the Plaintiff?

44. Even though Roosevelt's administration never acknowledged and/or mentioned the "Out of Area" program, the Plaintiff knew the value and the marketability potential. The Plaintiff had created a program that had the potential to permanently alter the Public Education Sector for the better.

45. During the middle of May 2004, the Plaintiff met with officials from the Department of Elementary and Secondary Education (DESE) in Jefferson City and they helped him initiate a business proposal to assist with marketing.

46. The Plaintiff started a business called Alternative Discipline and Behavioral Concepts in late May of 2004.

47. Throughout the programs implementation 2003-04 school year and until August 11th 2004, the Plaintiff maintained all of the important documents, which would have been needed for any other person to implement the Plaintiff's "Out of Area" program.

48(a). As it turns out, the SLPS used what few documents they could acquire from the Plaintiff, such as the "Out of Area" Hall Pass, throughout the district starting during the first week of March 2004, in congruence with the Plaintiff's program.

48(b). In other words, when the plaintiff started his program on March 3rd 2004, Mr. Warmack started using an exact replica of the Plaintiff's Hall Pass, which he slightly altered, at Roosevelt High School starting on March 6th of 2004.

49(a). At the end of May 2004, the Plaintiff began approaching DESE and spoke with a few other school districts about his "All – School" behavioral modification program.

49(b). On May 26th 2004, the Plaintiff was blatantly informed by; Mr. Gunther and Dr. Hutchins, that he had to sign his SLPS contract within two (2) days or his employment position at Roosevelt H.S. during the 2004-05 school year would be jeopardized.

50. Throughout the entire 2004 summer, SLPS officials continuously told the Plaintiff his staff training and development services would be utilized with compensation soon. The truth was, the SLPS didn't have enough literature to implement his program.

> c. The Plaintiff didn't acquire any lesson plans to modify; therefore, he couldn't hand in any lesson plans.

40. Upon this threat of a potential termination, the Plaintiff decided to help Roosevelt's administration, by helping them control and modifying the disruptive and disrespectful students behaviors.

41. On his own time, with his own good faith, and keeping the SLPS children and students well being first, the Plaintiff created on his own time, developed on his own time, and solely implemented, with support from a few of his teaching peers, at Roosevelt's 9th Grade Center his "All – School" Behavioral Modification program, which he called and currently refers to as his, "Out of Area" program.

> a. It took the Plaintiff eight (8) weeks to prepare his Team 2 teaching peers how the program will work.
>
> b. The program worked better than anyone imagined.
>
> c. For the first time in their lives, the 9[th] grade students at Roosevelt had consistent consequential actions along with being weekly for good behavior.
>
> d. The "Out of Area" program is recognized as Patent Application No: 11/153,118.

42(a). After approximately ten (10) weeks of implementation (March 3rd – May 5th), Roosevelt's administration intentionally sabotaged the program, and went as far as threatened the Plaintiff with severe consequences for all of his hard work.

42(b). Upon Mr. Gunther's unwarranted threats on May 6th 2004, the Plaintiff, and since he had accumulated enough documentation to market his program, the program stopped upon the departure of the students currently placed in the program.

43. The Plaintiff successfully completed all of his required employment obligations and then went above and beyond all expectations and successfully implemented his "Out of Area" program, even though Roosevelt's administration continuously and eventually destroyed the program.

       a.  A special education "resource teacher" is basically a teacher assistant that
provides support for the regular classroom teacher. Resource teachers must
complete IEP'S, re-evaluations, and other detailed paperwork for the special
education students on their caseload. Caseloads usually consist of
approximately 8 – 12 students.

       b.  Employment expectations for "self-contained" special education teacher are
much different that resource teachers. Self-contained teachers have no
assistant, they must complete; daily/hourly attendance, weekly lesson plans,
prepare quarterly progress reports and grades, prepare and teach all of their
classes along with completing the required IEP'S, re-evaluations, and other
special education related paperwork. Self-contained teachers can't just take a
break and leave the classroom whenever they want. There is a high turnover
rate for self-contained special education teachers.

36. While employed with SSD, the Plaintiff never had to; take attendance, complete

progress reports or grades, no lesson plans, no papers to grade and/or prepare, and then teach any

classes. SSD accommodated the Plaintiff's employment expectations for his and the schools

benefit.

37. With the help of Mrs. Reign, who was the special education department chairperson,

the Plaintiff completed approximately 10 IEP'S and all other required special education

paperwork accordingly.

38. Upon observing the unimaginably inappropriate student behaviors daily at

Roosevelt's 9th Grade Center, the Plaintiff was amazed at the lack of, staff awareness, training

and development referencing behavioral modification. Administration and the disciplinarians

had no concept how to manage the student behaviors while supporting their teaching staff.

39. After approximately 10 weeks of employment, the Plaintiff was written-up in a letter

dated January 14th 2004, and threatened with a termination because he had not handed in any

lesson plans. As a resource teacher, his expectations were to modify the regular teachers lesson

plans to accommodate the special education students.

       a.  The regular classroom teachers the Plaintiff worked with didn't hand in
lesson plans, along with almost every other teacher at Roosevelt's 9th Grade
Center.

       b.  No other teacher had been threatened with a termination for not handing in
any lesson plans, even after years of doing so.

# CAUSES FOR ACTION

100. Causes for Action will begin with sentence/paragraph number 100.

101. Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

102. Plaintiff reserves the right to Amend and/or Modify any of the referenced Causes

for Action upon his acquirement of factual knowledge related to the Causes of Action referenced

within this Complaint.

## 1st CAUSE FOR ACTION

### Defamation
#### Against: But not limited to, Warmack

105. Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

106. Plaintiff acknowledges that Cause of Action for Defamation will start with sentence

number 105.

107. Defendant Warmack intentionally, willfully, and for his own selfish advantages,

maliciously and with pure evil Defamed the Plaintiff by; but not limited to, calling, referencing,

implying, stating, and/or manipulating other(s) into thinking that the Plaintiff is/was "CRAZY,"

on at least; but not limited to, one (1) occasion, and in the presence of at least; but not limited to,

one (1) other person after the 26th day of May 2004, and prior to October 2nd of 2004.

> a. Defendant Warmack approved the Plaintiff's employment retention through
>    the district probationary letter dated and signed by Warmack on the 28th day
>    of January 2004, therefore, Warmack didn't think the Plaintiff was
>    "CRAZY" prior to that date.
>
> b. Warmack highly encouraged; through Defendant Gunther, for the Plaintiff to
>    sign his teaching contract for the 2004-05 school year by the 26th of May
>    2004, in order to acquire a secure employment position at Roosevelt High
>    School, which was at that time, Warmack's assigned employment location
>    with the SLPS, therefore, Warmack obviously didn't think the Plaintiff was
>    "CRAZY" prior to that date.

    c.  Referencing sentences 107, subsections: (a) and (b); if Warmack truly believed the Plaintiff was "CRAZY," why would he want the Plaintiff employed, not only with the SLPS, but; at his employment location (which would have demonstrated Gross Negligence and Dereliction of his Duties by placing the welfare of the students in jeopardy with a "Crazy" teacher on the loose teaching at Roosevelt)?

    d.  Warmack supported and convinced the former SLPS Board of Education members; Clinkscale, Schoemehl, Hilgerman, Jackson, Archibald, Hass, and O'Brian, to approve a business relationship with his friend and Defendant Lee and/or Lee's; SSS company; which was not an only illegally registered company; but totally unqualified to implement the Plaintiff's program, on or within a close proximity of October 6th 2004, that included a compensation to Lee of approximately $700,000.00 along with a $7,000.00 incentive bonus to be acquired by Defendant Crues.

108. Therefore, any person of reasonable intelligence could and would assume that

Defendant Warmack really didn't think the Plaintiff was **"CRAZY,"** and that Warmack's

statements referencing that the Plaintiff is/was "Crazy" were intentional, implied maliciously and

**DEFAMING**, therefore resulting in the Plaintiff encountering significant emotional sufferings

and physical injuries.

109. Any person of reasonable intelligence could and would assume that Warmack

intentionally and willfully defamed the Plaintiff to other referenced Defendants, in addition to

Local 420 Union Officials, and possibly numerous other persons, to acquire personal advantages

while justifying the compensation of his friends to implement the Plaintiff's program, even

though the SLPS had indicated to the Plaintiff that he (the Plaintiff) would be compensated by the

SLPS to implement his programmatic services accordingly.

**WHEREFORE**, as a proximate result of Defendant Warmack; intentionally, willfully

maliciously, and with pure evil motives, Defaming the Plaintiff, the Plaintiff has suffered

significant emotional suffering to include; but not limited to, mental anguish and distress, which

was intentionally inflicted by Warmack onto the Plaintiff, along with physical injuries such as;

but not limited to, sleeplessness, weight loss, and deprivation of numerous activities considered to

be normal by any reasonable person.

Plaintiff seeks the Actual Damages in the amount equivalent to the amount of compensation he lost that was awarded; (a) to Lee, which was $700,000.00, (b) in addition, the $7,000.00 incentive bonus that was acquired illegally by Crues, and; (c) $2,100,000.00 that was awarded to AU to take over the Plaintiff's program and/or by referencing the Doctrine of Equivalents, actions by AU thereof and/or within a close relationship of the Plaintiff's claims thereof, and finally; (d) all other such relief that the Court deems reasonable, just and proper when considering all of the intentionally inflicted Damages by Warmack onto the Plaintiff.

If and only if the Plaintiff acquires **Actual Damages** in the equivalent of $2,707,000.00, the Plaintiff will only seek the same and/or the equivalent amount of **Punitive Damages** thereof. In the alternative, if the Actual Damages are not equivalent to or in excess thereof the referenced $2,707,000.00, the Plaintiff will exercise and demand his right to acquire two (2) or four (4) times the amount of Actual Damages which should legally and justifiably be awarded to the Plaintiff, which will be incongruence with state laws accordingly.

# 2nd CAUSE FOR ACTION

## Fraud
### Against:  Hutchins, Warmack, Crues, Hopper, former SLPS Board Members, and Brostrum

110.  Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

111.  Causes of Action referencing Fraud will start with sentence 110.

112.  Each Defendant referenced in the Plaintiff's 1st Cause for Action, whether willfully

or unintentionally, participated in at least one (1); but not limited to one, Fraudulent Act against

the Plaintiff.

113.  Defendant **Hutchins** Fraudulently misled and lied to the Plaintiff when they met in

his office on May 21st of 2004.  Hutchins ensured the Plaintiff that he would be employed by the

SLPS and compensated to provide disciplinary services to the SLPS during the summer of 2004

and throughout the 2004-05 school year.  At the time of this meeting, Hutchins had already

"become aware" of the Plaintiff's and his behavioral program.

> a.  Hutchins knew the Plaintiff would act in reliance on his false, misleading, and inducing statements.
>
> b.  Hutchins demonstrated behaviors "Fraudulent in his inducement," thereby injuring the Plaintiff without vitiating the Plaintiffs contract.
>
> c.  Plaintiff relied and acted upon Hutchins deceptive and extrinsic fraudulent suggestions, which demonstrated bad faith, lacked integrity, and moral turpitude by Hutchins; through, the Plaintiffs correspondences dated May 31st 2004, which were addressed and delivered to numerous SLPS middle school administrators.
>
> d.  Hutchins false statement goes to the heart of Plaintiffs damages, which have significantly devastated the Plaintiff.

114.  Defendant **Warmack** misled and lied to the Plaintiff on September 15th 2004, when

he looked the Plaintiff in his eyes and said, "I have never heard of your "Out of Area" program.

Do you think Mr. Gunther was aware of it?"

a. Warmack was fully aware of the Plaintiff's program even before the Plaintiff began implementing it.

b. Warmack began using part of the Plaintiff's program at Roosevelt H.S. within three (3) days upon his acquirement, which was on March 3rd of 2004, of the Plaintiff's "Out of Area" Hall Pass.

c. Warmack, while supporting the Fraudulent Acts of other Defendants, used bad faith, and Fraudulently induced the Plaintiff, who acted upon his false statements and misrepresentation of the facts.

d. As a result of the Plaintiff relying on Warmacks Fraudulent Acts, the Plaintiff suffered significant damages.

115. Defendant **Crues** orchestrated the most significant Act of Fraud. Defendant Crues

Fraudulently misled the Plaintiff and the public, and possibly the entire former SLPS Board

members, when convinced the Board to approve a $7,000.00 compensation bonus if and/or when

he initiating the Plaintiff's program. Plaintiff owned 100% of all Intellectual Property (IP) from

the referenced program, meaning Crues owed the Plaintiff a royalty fee, which would have been

based on a percentage of his compensation bonus.

a. Crues misled the Plaintiff and public by advertising his initiation of the Plaintiff's program under a false pretense that he (Crues) created and would initiate his program.

b. Crues knew he was lying and that he didn't create the referenced program, which is clearly a Fraudulent Act.

c. Through the Plaintiffs correspondence to Crues dated August 11th 2004, Plaintiff relied on Crues to perform his duties accordingly.

d. As a result of Crues's Fraudulent Acts, the Plaintiff has suffered significant and irreplaceable damages.

116. The Plaintiff offered to implement his program at Roosevelt H.S., through his

correspondence dated October 20th 2004 to the Defendants. Defendant Hopper replied through a

note on October 22nd 2004 saying, "Clark, we looked it over & like it, but it isn't in the budget."

117. In the Plaintiff's letter dated October 20th 2004, not only was the Plaintiff trying to

help the SLPS, but; the Plaintiff indicated that if he could implement his program and be relieved

of his current employment expectations, the Plaintiff's disability would have been accommodated.

118. Defendant **Hopper** Fraudulently responded to the Plaintiff's comment referencing

"its not in the budget," because the Plaintiff offered to implement his program in his letter dated

October 20th 2004, at his current teaching salary, which amounted to no alteration of the budget.

> a. Hoppers statement was intentionally misleading, deceptive, and minimized the quality of the Plaintiffs proposal, which was provided with good faith and in the SLPS student's best interest.
>
> b. Hopper knew the Plaintiffs program had already been distributed, discussed, and awarded to another individual to implement for $700,000.00.
>
> c. Hopper knew his verbal statements and written correspondence were administered under a false and deceptive pretence.
>
> d. Plaintiff initially believed Hopper, acted upon it, and without further discussions, continued his employment expectations, which have resulted in the Plaintiff suffering significant damages, as noted in the plaintiff's Right to Sue letter from the EEOC.

119. The **former SLPS Board of Education** members approved to compensate an

unqualified and illegally registered foreign company, which was created by a personal friend of

Crues and Warmack $700,000.00 when they were, or should have been aware, that the program

was created and owned by a SLPS employee and/or that the program in reference was created by

an employee, who is also a human being with a heart and emotions who was only trying to help

the SLPD through his "good faith" efforts and dedication to making the SLPS a better district.

> a. Former SLPS Board members may or may not have been aware that a SLPS employee was the creator and owned all Intellectual Property assets of the referenced program.
>
> b. The following Defendants; but not limited to, Crues, Hutchins, Warmack, Hopper and Brostrum each had full knowledge of the facts surrounding this matter (Cause for Action) and that their Fraudulent Conspiratorial Acts were deceptive, unlawful and very inappropriate.
>
> c. Former SLPS Board members may or may not have known that Defendant Crues had acquiring an illegal compensation bonus, which the former SLPS Board members approved in June of 2004, which was possibly the primary purpose behind Defendant Brostrum orchestrating the Emergency Board Meeting (EBM); through publicizing the increased salaries to the media on the 11th of November, leading to the EBM on the 12th of November, which involving the referenced former SLPS Board of Education members.

      d. The referenced emergency board meeting resulted in; not only the police
         responding to two (2) 911 calls, but the termination of Defendant Crues as
         Superintendent of the SLPS.

      e. Former SLPS Board members Fraudulently relied upon the media to
         convince, not only the Plaintiff, but; the public that Crues was terminated for
         unjustifiable salary increases allotted to numerous of his SLPS peers and
         personal friends.

      f. The Plaintiff relied on the former SLPS Board member's public
         acknowledgment, which turned out to possibly be a deceptive and a false
         misrepresentation of facts.

120. Defendant **Brostrum** obviously had full knowledge of the overt and Fraudulent

Acts of his clients to include; but not limited to, the following;

      a. Brostrum oversaw the contractual agreement between Crues and the SLPS,
         which included the Fraudulent $7,000.00 compensation bonus acquirement
         to Crues for initiating the Plaintiff's program.

      b. Defendant Brostrum knew the contractual arrangement was misleading and
         illegal.

      c. Plaintiff assumed that legal counsel from a reputable attorney would be
         appropriate, established on good faith, and legal.

      d. However, Defendant Brostrum's conduct demonstrated, but not limited to, an
         intentional and willful act of "bad faith," dishonesty, a lack of integrity, and
         moral turpitude. As a person with above average intelligence, experience in
         contractual relationships, and above reasonable expectations, Brostrum
         clearly acted Fraudulently.

      e. As a result of the Plaintiff's reliance of defendant Brostrum's "good faith,"
         the Plaintiff has suffered significant damages.

      f. As a reputable attorney, Brostrun should be held accountable for his
         intellectual capacity to construe such an Overt Conspiratorial Act.

121. The referenced former SLPS Board members, some of which may or may not have

knowledge of the Fraudulent and Conspiratorial Acts of other Defendants. However, the former

SLPS Board did approve a Fraudulent Act, and acted accordingly by supporting the Fraudulent

Act by compensating Crues, $7,000.00 to initiate the implementation of another persons

Intellectual Property (IP).

**WHEREFORE**, Plaintiff prays for a judgment in his favor and against the referenced Defendants, jointly and severally, which as a result of their Fraudulent Actions, have caused significant emotional sufferings such as, but not limited to, embarrassment, humiliation, mental distress and anguish onto the Plaintiff, along with physical injuries such as; but not limited to, sleeplessness, weight loss, and loss of consortium. Plaintiff requests that this Court enters a judgement in excess of $707,000.00 for **Actual Damages**, and not more than $2,100,000.00 against the Defendants to the Plaintiff along with all other relief this Court deems reasonable given the facts surrounding this Cause.

**IF SCHOOL DISTRICT OFFICIALS** to include the; Board of Education, Superintendent, Assistant Superintendent, numerous top authoritative and decision making officials, incongruence with the districts legal counsel, are allowed to Fraudulently conduct themselves in a manner such as the Defendants have conducted themselves against the Plaintiffs, our entire Educational System would be damages. A precedent needs to be set and the Plaintiff demands that this precedent be established NOW. To ensure that the future of our nations Public Educational Sector is not dismantled; Plaintiff should acquire and demands Punitive Damages to be equivalent to twice or quadruple the amount of Actual Damages sought by the Plaintiff, and other such relief that this Court deems reasonable and just under the circumstances presented in this Cause for Action.

Plaintiff, Alternative Discipline and Behavioral Concepts (ADBC), has also suffered significant damages as a result of the referenced Defendants Fraudulent actions. ADBC has the potential of restructuring the entire Public School Sector referencing quality disciplinary and behavioral modification programmatic services, such as have never been implemented and/or as recognized in our current Public School Sector. As a result of the Defendants Fraudulent actions, Plaintiff,Clark, in congruence with Alternative Discipline and Behavioral Concepts, have both suffered greatly.

**Plaintiff, ADBC,** prays now before this Court that it is compensated for; but not limited

to, losses in the form of;

- (a)  Economic losses in the form of lost future revenue, profits derived there from and related consequential damages,

- (b)  Expectancies from future ripening and/or damages to its reputation (if a permanent injunction is not placed on the SLPS),

- (c)  Standing ability, to include damages to its reputation and ability to earn profits along with future pecuniary losses,

- (d)  And considerations of the potential marketing and implementation of services, which could have been extremely high, which is why the SLPS strategically worked so hard to fully acquire the referenced program,

**WHEREFORE,** ADBC requests that this Court enter a judgment against the Defendants,

jointly and severally, in such a sum that may be fair and reasonable, such as the compensation

approved to AU, and/or Defendant Lee, which would be the equivalent of $700,000.00 and

$2,100,000.00 accordingly, along with the $7,000.00 compensation bonus awarded to Crues, and

all other relief this Court deems reasonable and/or as justice may require.

# 3rd CAUSE FOR ACTION

## Constructive Fraud
## Against: Gunther, Warmack, Crues, Hutchins, and the former SLPS Board of Education

122. Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

123. Defendant Gunther was the administrator at Roosevelt's 9th Grade Center, during

the 2003-04 school year.

- a. Gunther acquired valuable documents from the Plaintiff referencing the "Out of Area" program.

     b. Through no fault of his own, Plaintiff reposed trust in Defendant Gunther.

     c. Gunther abused the trust, obtained unjust enrichment from the Plaintiff's program, and failed to adequately reverse his actions.

     d. As a direct result of Gunthers Constructive Fraud, the Plaintiff has suffered significant damages.

124. Defendant Warmack, who acquired the valuable referenced program documents

from; not only Gunther, but; the Plaintiff along with the Plaintiff's PGT Team 2 teaching peers.

     a. Warmack acquired valuable programmatic documents, which he used to unjustly enrich his well being, acquired a promotion during the summer of 2004 to the assistant superintendent of SLPS High Schools during the 2004-05 school year.

     b. Through no fault of his own, Plaintiff reposed a trust in Warmack.

     c. Warmack abused the trust, obtaining unjust enrichment (financial, prestige, employment status) from the Plaintiff's "good faith."

     d. As a result of Warmacks strategically choreographed Constructive Fraudulent Acts, the Plaintiff has suffered significant and irreplaceable damages.

125. Defendant Crues acquired the valuable programmatic documents from Warmack

and the Plaintiff.

     a. Plaintiff, through no fault of his own, reposed trust in Defendant Crues.
     b. Crues abused the trust, and obtained unjust enrichment (financial, employment status, a compensation bonus, and prestige) from the Plaintiff's Damages.

126. Defendant Hutchins acquired valuable information from the Plaintiff on May 21st 2004.

     a. Plaintiff, through no fault of his own, reposed trust in Hutchins.

     b. Hutchins abused the trust and obtained unjust enrichment (prestige) as a direct result from the Plaintiff's sufferings.

127. Although the former SLPS Board of Education (Clinkscale, Schoemehl, Hilgerman,

Jackson, Archibald, Hass, and O'Brian) may or may not have been fully aware of the facts

surrounding the actions of the other referenced Defendants. Even though the former SLPS Board

members had not intended to defraud the Plaintiff, a Cause for Action still rises in equity to

prevent the unjust consequence of the Defendant's wrong.

**WHEREFORE**, Plaintiff prays for a Judgement in his favor and against the referenced Defendants, directing he be awarded: (a) compensatory damages in excess of $707,000.00; (b) Punitive Damages in the amount of twice any damage award, pursuant to RSMo.417.457, due to the defendants Outrageous misappropriation, evil motive, and reckless indifferences to the civil rights and well-being of the Plaintiff; (c) disgorgement of all profits obtained by contractual entities resulting from their contract to implement the Plaintiff's programs; (d) all damages sustained by the Plaintiff resulting from the Defendant's unlawful actions; (e) Plaintiff's cost's and expenses incurred in connection with their actions, to include; but not limited to, attorney and counsel fees, and (f) such other and further relief as this court deems reasonable and justifiable.

# 4th CAUSE FOR ACTION

## Breach of Fiduciary Duty
### Against: Crues, Hutchins, Warmack, Hopper, Shead, and Gunther

128. Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

129. Causes of Action referencing Breach of Fiduciary Duty will start with sentence 128.

130. As the Superintendent of SLPS, Assistant Superintendent High Schools, and as the

Plaintiff's direct and indirect supervisors during the 2003-04 and 2004-05 school years, the

referenced Defendants owed the Plaintiff Fiduciary Duties to act in good faith, honestly, and with

fairness when dealing with the Plaintiff and his program.

- a. **Crues**, Intentionally Breached his Fiduciary Duty to the Plaintiffs by; but not limited to;
  - i. Accepting the Plaintiff's copyright protected program on August 11th 2004, and using it for his own personal advantage.
  - ii. Acquiring an unlawful $7,000.00 bonus compensation for initiating the Plaintiff's program.
  - iii. Undertook to counsel and guard ADBC.
  - iv. Inducing the SLPS Board to approve the referenced $7,000.00 bonus.
  - v. Conspiring with other Defendants to defame the Plaintiff.
  - vi. Minimize the Plaintiffs knowledge of districts disciplinary activities so that he could enhance his own personal prestige.
  - vii. Intentionally inflicting emotional distress onto the Plaintiff by isolating the Plaintiff throughout the 2004-05 school year.
  - viii. Attempting to sabotage the Plaintiff's business potential, while maximizing the usage of the Plaintiff's program throughout the SLPS.
  - ix. Collaborating with other Defendants to prosper greatly by strategically marketing the Plaintiff's program to other school districts throughout the nation.

       x. Using the Plaintiffs program to help secure his employment position
           as the Superintendent of the SLPS.

      xi. Employed through a contractual agreement an unqualified and
           illegally created company called School Service Systems L.L.C.,
           which was started by Robert Lee who is a Defendant in this suit and
           a personal friend, then coerced the SLPS Board to compensate Lee
           $700,000.00 to implement the Plaintiffs program, even though Lee
           had no concept how to implement it.

     xii. Encouraging the SLPS Board to Adopt policy number P3323.5,
           which targeted the Plaintiff and eliminates employment options for
           former SLPS employees from providing educational related services
           to the SLPS for two (2) years.

    xiii. Coerced the SLPS board to Revising policies P1171 on October 14th
           2004, which minimized "Public Records Available Under the
           Missouri Sunshine Open Record Law."

    xiv. Coerced the SLPS Board to Revise Policy P8421, which references
           Internal board Policies related to "Conflict of Interest/Nepotism," on
           September 14th 2004.

b. **Hutchins**, Intentionally Breached his Fiduciary Duties to the Plaintiff by; but
   not limited to,

       i. Helping Defendant Crues acquire his $7,000.00 bonus.

      ii. Undertook to advise, counsel, and protect the Plaintiff upon their
          conference meeting in his office on the 21st of May 2004.

     iii. Intentionally inflicting emotional distress onto the Plaintiff by lying
          to the Plaintiff by; but not limited to, encouraging him to correspond
          with SLPS administrators while he knew the Plaintiff was wasting
          his time.

     iv. Encouraging SLPS middle school administrators, such as Mr. Teferi,
          to contact the Plaintiff with an objective of manipulating the Plaintiff
          into thinking his program was the same as the staff training and
          development services currently being provided to the SLPS by
          professionals from Maryville University.

      v. Collaborating with other Defendants with an objective of prospering
          personally by strategically marketing the Plaintiff's program to other
          school districts throughout the nation.

c. **Warmack**, Intentionally Breached his Fiduciary Duties to the Plaintiffs by; but not limited to,

    i. Helping Crues manipulate the former SLPS Board and acquire his unlawful $7,000.00 bonus.

    ii. Undertook to advice, and counsel, through coerciveness and lies, the Plaintiff.

    iii. Undertook to counsel and guard ADBC.

    iv. Conspired with other Defendants to defame and distract the Plaintiff, with a goal of making the Plaintiff a former employee, which was the purpose for Adopting P3325.5.

    v. Intentionally Inflicted Emotional Distress onto the Plaintiff continuously throughout the 2003-04 school year and again throughout the 2004-05 school year by pounding the Plaintiff with unwarranted and unobtainable employment expectations, while he prospered off the Plaintiffs program.

    vi. Collaborated with numerous other Defendants with an objective of gaining personal satisfaction by strategically marketing the Plaintiff's program.

    vii. Acquired his position as the assistant superintendent of SLPS by secretly promoting and utilizing the Plaintiff's program.

    viii. Attempting to sabotage the Plaintiff's business potential, while maximizing the usage of the Plaintiff's program throughout the district.

    ix. By separating, demoting, coercing, and manipulating the Plaintiff's former teaching peers and other support staff personal with whom the Plaintiff had befriended from Roosevelt's 9th Grade Center, each of which were fully aware of the Plaintiffs program and his ADBC business services.

    x. By lying to the Plaintiff on September 15th 2005 when he said, "I have never heard of your "Out of Area" program. Do you think Mr. Gunther was aware of your program? Thank you for sharing this and allowing me to review your proposal."

    xi. Referencing number x., Warmack was fully aware of, not only the Plaintiff's program proposal, but that the district already approved to compensate Defendant Lee $700,000.00, who was a friend of his, to implement the Plaintiffs proposal.

xii. Collaborated with other Defendants and Coercing the SLPS Board to Revise policies P1171, which minimized, "Public Records Available Under the Missouri Sunshine Law." This Policy P1171 was Revised at the following SLPS Board meeting on October 12th 2004, which was approximately four (4) weeks after the Plaintiff showed up in his office.

xiii. Collaborating with other Defendants upon his acquirement of knowledge that the Plaintiff was not going to quit his teaching assignment, by coercing the Board to Revise policy P8241 on September 14th 2004. Policy P8241, which is an internal board policy, references Board members and their potential "Conflict of Interest/Nepotism."

xiv. By Intentionally using the Plaintiff's ADD disability against him with an objective of forcing him (the Plaintiff) to quit, fail at his teaching assignment, and/or become a former employee any way possible.

d.  Defendant **Hopper**, Intentionally Breached his Fiduciary Duties to the Plaintiff by; but not limited to,

  i.  Dehumanized the Plaintiff, his character, and other irreplaceable employment attributes as referenced in the sentences below.

  ii.  Lying to the Plaintiff on October 22nd 2004, when he responded to the Plaintiff's offer to implement his program at Roosevelt H.S. at his current teaching salary, which would have not only saved the district $700,000.00, but would have provided the district with quality and a successful programmatic services.

  iii.  Misappropriating the Plaintiff dependency to protect and provide advice accordingly, which was one of Hoppers expectations as the Plaintiff's primary supervisor during the 2004-05 school year.

  iv.  By refusing to accommodate the Plaintiffs disability, upon numerous verbal and written requests, which threatened the Plaintiff's employment status and may have led to the districts decision to not renew, but; terminate the Plaintiff's employment on June 13th 2005, which was the last day of the 2004-05 school year.

  v.  By refusing to evaluate the Plaintiff, who was the only teacher at Roosevelt H.S. during the 2004-05 school year that didn't acquire a formal summative evaluation, even though Hopper promised that he would formally evaluate and complete the summative evaluation processes for all teachers. Plaintiff requested in writing numerous times his desire for a formal evaluation to be completed accordingly.

  vi.  When he repeatedly Harassed the Plaintiff through numerous unwarranted write ups, some of which threatened the Plaintiff with a potential termination.

vii. By retaliating against the Plaintiff, through; but not limited to, employment alterations, write ups, and unlimited invalid comments such as, "the SLPS has no use and/or money in the budget for your proposal, following most of the Plaintiff's inquiries and investigative actions referencing his programmatic services.

viii. By inappropriately harassing other employment peers of the Plaintiff from Roosevelt's 9th Grade Center, who had knowledge referencing the Plaintiffs program and ADBC business.

ix. Attempting to sabotage the Plaintiff's potential business, while knowing that the Plaintiff's program was being implemented throughout the SLPS.

x. Intentionally Inflicting Emotional Distress onto the Plaintiff repeatedly and throughout the entire 2004-05 school year.

xi. Conspiring with other Defendants with an objective of dehumanizing the Plaintiff, his character, and his future aspirations.

e. Defendant **Shead**, Intentionally Breached her Fiduciary Duties to the Plaintiff by; but not limited to,

i. Conspiring with other Defendants to defame the Plaintiff.

ii. Conspiring with other Defendants to utilize the Plaintiff's disability for an unlawful advantage.

iii. The Plaintiff depended on Shead, who was the head principal at Roosevelt H.S., during the 2004-05 school year. It was her responsibility to protect the Plaintiff from employment discrimination and other unsafe employment situations such as; but not limited to, referencing viii sentence below.

iv. Intentionally Inflicting Emotional Distress onto the Plaintiff throughout the entire 2004-05 school year.

v. Inappropriately investigating personal activities of the Plaintiff and his behaviors accrued off school property.

vi. Writing up the Plaintiff basing every allegation on unfounded allegations made by a students parent referencing his supportive assistance to students, which he was assigned the responsibility of advising accordingly.

vii. Not allowing the Plaintiff to respond accordingly to the referenced write-up above (v.), and shifting the responsibility onto another Defendant to verbally inform the Plaintiff everything is OK referencing the write up.

        viii. Not taking action upon the request of the Plaintiff to investigate the activities surrounding someone impersonating the Plaintiff on January 6th 2005.

   f. Defendant **Gunther**, Breached his Fiduciary Duties to the Plaintiff by; but not limited to,

        i. Conspiring with other Defendants to unlawfully acquire the Plaintiffs program during the spring, of the 2003-04 school year at Roosevelt's 9th Grade Center.

        ii. Inappropriately writing the Plaintiff up in his letter dated January 15th 2004, which threatened the Plaintiff with a potential termination for not turning in any lesson plans, when he knew the Plaintiff couldn't turn lesson plans accordingly.

        iii. Selectively threatening the Plaintiff, and only the Plaintiff, for not handing in any lesson plans referenced in sentence ii above.

        iv. Plaintiff depended and trusted Gunther referencing the Plaintiff supplying Gunther with, up to date materials and correspondences, referencing the Plaintiffs program.

        v. Advertising the Plaintiff's program materials, even though the Plaintiff placed a "Confidentiality Notice" on his program materials.

        vi. Disclosing, discussing, and/or advertising, behind the Plaintiff's back, program materials to other Defendants.

        vii. Sabotaging the Plaintiff's program at Roosevelt's 9th Grade Center in May of 2004.

        viii. Threatening the Plaintiff with an unwanted outcome if he didn't sign a teaching contract with the SLPS for the 2004-05 school year.

        ix. Defaming the Plaintiff by not following evaluation procedures referencing the Summative Evaluation policies.

        x. Intentionally Inflicting emotional Distress onto the Plaintiff by; but not limited to, ignoring the success if his program in March and April of 2004, intentionally setting the Plaintiff's successful program to; not only failure, but humiliation from numerous students and staff upon Gunther's refusal to comply with the consequential aspects, which he previously complied with.

131. As a direct and proximal result of the foregoing activities of each referenced

Defendant who intentionally and indisputably Breached their Fiduciary Duties to the Plaintiff, the

Plaintiff has suffered extensive monetary and other damages to include; but not limited to, non-economical damages, consequential damages, and pecuniary damages.

**WHEREFORE**, Plaintiff's pray for this Court to joinder the Defendants and find them liable, jointly and severally, and enter a Judgment in the Plaintiff's favor. Plaintiff seeks; (a) **Compensation Damages** in an amount in excess of $707,000.00; (b) **Punitive Damages** in the amount of twice the requested Compensatory Damages; (c) the Disgorgement of any and all compensation awarded to AU, which is $2,100,000.00; (d) the cost for the Plaintiffs time equivalent to the potential profit from the implementation of the Plaintiffs program, a financial allotment for time and research, and compensation for materials needed by the Plaintiff to acquire the knowledge and physical attributes (copies, paper, filing cabinets, medication), along with a judgment concerning headache fees resulting from the unhealthy high dosage of medication required to figure out what the SLPS and the referenced Defendants did to the Plaintiff and to provide the plaintiff with the brainpower to strategically defend himself, which may end up as a total waste of time, justifiably against one of most politically oriented business entities within the City of St. Louis, State of Missouri; (e) and all other such relief as this Court deems just, proper, and reasonable.

# 5TH CAUSE FOR ACTION

## Conversion
### Against: Crues, Warmack, Hopper, Gunther, Lee, along with former SLPS Board of Education

132. Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

133. Conversion Causes of Action will start with sentence 132.

134. Defendants; Crues, Hutchins, Warmack, Hopper, Gunther, Lee, along with the

former SLPS Board of Education members have intentionally deprived the Plaintiff's right to

enjoy his Intellectual Property (IP), as he had expected and anticipated, when he signed his

employment contract with the SLPS for the 2004-05 school year.

135. Upon the numerous correspondences that reference the Plaintiff's interest and

expectations of implementing his program for the SLPS, Defendants; Crues, Hutchins, Warmack,

Hopper, Gunther, Lee, along with the former SLPS Board of Education members, have

intentionally and wrongfully deprived the Plaintiff from the enjoyment of utilizing and

implementing his Intellectual Property.

      a. Defendants, Hutchins, Gunther, and Warmack intentionally coerced the Plaintiff into signing his 2004-05 SLPS contract by misleading him referencing his employment expectations, for the 2004-05 school year.

      b. Plaintiff was induced and led into a false impression of his future duties.

      c. Plaintiff prepared himself and ADBC to implement his program for the SLPS, during the summer of 2004 for the, 2004-05 school year as a direct result of the misrepresentation and misleading acts of the referenced Defendants.

      d. Financial compensated, which was thoroughly reviewed and promised by Defendant Hutchins to the Plaintiff, turned out to be deceptive and misleading.

      e. The former SLPS Board of Education, through enticement and coercion on behalf of Defendants; Crues, Hutchins, and Warmack, approved to compensate Defendant Lee and/or Lee's illegally organized business; School Service Systems, $700,000.00 to implement the Plaintiff's program.

f.   Defendant Lee, although his actions may have been unintentional, incongruence with the former SLPS Board of Education, converted the Plaintiff's employment expectations, therefore acquiring and utilizing the Plaintiff's Intellectual Property, for their own use without the Plaintiff's permission and with deception, which prevented the Plaintiff from knowing about and/or asserting certain rights.

g.   Defendants may or may not have an implied license and/or a shop right to utilize the Plaintiff's program; however, the Defendant's actions were outrageous, unethical, and immoral referencing their evil disrespect, motive, and reckless indifference to the rights of the Plaintiffs.

**WHEREFORE**, the Plaintiffs prays that this Court enter a judgment against the

Defendants, jointly and severally, (a) **Actual Damages** in the amount in excess of $100,000.00;

based on the Defendants improper acquirement of the Plaintiff's program materials on days when

he was absent along with acquiring program materials from his computer, which was then

sabotages beyond repair after June 15th 2004, and when considering the intentional, willful, and

malicious actions to Deprive the Plaintiff from his normal life activities, referencing his altered

non-retention letter and the districts intentional interference with the Plaintiffs application for

unemployment, a; (b) **Punitive Damage** award in the amount in exceed four (4) times the amount

of the requested Actual Damages, which would be fair and reasonable, plus; (c) costs expanded

herein, and; (d) for such further relief as this Court deems just.

# 6th CAUSE FOR ACTION

## Injunctive Relief

**Against; but not limited to, Crues, Warmack, Hutchins, Pineau, Hopper, Shead, Gunther, Bates, former and current SLPS Board of Education members, Brostrum, St. Louis Public Schools, Lee & SSS (agents thereof), and Alternative Unlimited (AU) Inc. (agents thereof)**

136. Plaintiff restates each and every one of the allegations contained in the above

numbered paragraphs.

137. Injunctive relief Causes of Action will start with sentence number 136.

138. As an honest and former SLPS employee, the Plaintiff dedicated his free time,

incongruence with his behavioral modification knowledge, experiences, and offered to implement

his program at his current teaching salary (no extra expense) within the SLPS.

139. Instead, the Defendants abused the Plaintiffs good faith and approved to illegally

compensate Crues, along with approving to compensate two (2) unqualified companies a lot of

money to implement a program only the Plaintiff can successfully implement.

> a. Defendant **Crues** abused the Plaintiffs program, while acquiring personal compensation illegally from it.
>
> b. The Defendants strategically orchestrated a massive conspiracy to take advantage of the Plaintiff's good faith, while defaming, dehumanizing, and inflicted severe mental anguish onto him.
>
> c. The Defendants anticipated on profiting illegally off the Plaintiff's program by strategically marketing it to school districts nationwide.
>
> d. The Defendants have no concept how to successfully implement the Plaintiff's program. Staff training and development for the teachers, administrators, and support staff is the key to successfully implementing it.
>
> e. Compensating unqualified companies, who have never implemented a behavioral modification program such as the Plaintiffs, will only minimize the programs benefits, and confuse the SLPS children.
>
> f. The Plaintiff successfully and solely implemented his "Out of Area" program at Roosevelt's 9th Grade Center, with absolutely NO support from the Defendants (administration), while he was a special education resource teacher.
>
> g. What other forms of destructive disclosures, discussions, distributions, and advertisements will the referenced Defendants do that will continue to minimize and reduce the effectiveness of the Plaintiff's program?

h. How can the Plaintiff market his business while the referenced Defendants are defaming the Plaintiff and his credibility?

140. It would be in the best interest of the SLPS children and students for the Court to grant the Plaintiff with an Injunction; therefore, eliminating illegal misconduct and ensuring that no unqualified companies inflict more confusion onto the students and staff within the SLPS.

**WHEREFORE**, comes now the Plaintiff prying for an order preliminarily and permanently enjoining all referenced Defendants from competing against the Plaintiff and his ADBC business. The SLPS, and each enjoining party to include any agents employed within, is restricted from disclosing, distributing, copying, and/or advertising any confidential or proprietary information to any third party, and/or profiting financially from the Plaintiffs "Patent Protected" behavioral modification programs by law.

The Plaintiff may or may not request at the trial or before an order preliminarily and permanently enjoining all referenced Defendants from entering into and/or performing on any contract with the SLPS regarding discipline and any related behavioral issues.

In the alternative, if the SLPS, all referenced Defendants, former and current approved business entities (Lee, SSS, AU), correspond with the Plaintiff and the Plaintiff is reassured that his programmatic services are being implemented correctly, efficiently, and successfully with the best interests of the SLPS children and students being reserved as the primary focus of concern, the Plaintiff would without consideration establishing a cooperative business agreement allowing the referenced entities usage right opportunities if, and only if, the Plaintiffs program services are being implemented correctly and accordingly.

The plaintiff also reserves the right to request this Court to enter a judgment for any additional relief as it deems justifiable, reasonable, and appropriate.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

**COMES NOW, JAMES H. CLARK** (Plaintiff), and being first duly sworn upon

by oath, states that I have read the foregoing Complaint, and that the facts contained

therein are true and correct to the best of my knowledge, information and belief, and that

I sign the same as my free act and deed.

Respectfully Submitted,

**JAMES H. CLARK**
8276 Albin Avenue
St. Louis MO, 63114
(314) 426-6587 (home telephone)

Subscribed and sworn to me before this _24th_ day of _AUGUST_, 2005,

a Notary Public in and for said state that JAMES H. CLARK (Plaintiff) personally

appeared before me to be the person who executed the within Complaint, and

acknowledged to me that he executed the same for the purpose therein stated; that he

executed the same as his free act and deed; and that the facts contained therein are true

and correct to the best of his knowledge, information and belief.

DEBORAH J. ORCUTT
Notary Public - State of Missouri
County of St. Louis
My Commission Expires Sep. 8, 2007

As a proximate result of the Conspiratorial Acts intentionally inflicted onto the Plaintiff, the Plaintiff has encountered; but not limited to, severe emotional trauma, anguish and distress, along with physical injuries to include; but not limited to, sleeplessness, fatigue, loss of appetite & body weight, along with motivation to participate in normal life activities and trust referencing authoritative and decision making officials in employment and job related activities.

Within the past five (5) weeks, the Plaintiff has also been corresponding with; but not limited to, the FBI, the Missouri State Highway Patrol, additional conferences with his psychiatrist and psychologist, representatives from the Governors Council for People with Disabilities, and other Departments of the State of Missouri.

The Plaintiff has also encountered death threats.  The Plaintiff has also been the victim in several car accidents, one of which sent him to the hospital via an ambulance as result of lacerations he suffered to his scalp on January 12th 2005, which was the day before he was scheduled to meet with one of the Assistant Attorney Generals from the Missouri Office of the Attorney General in Jefferson City, for the purpose of turning over approximately 3,200 pages of correspondences to include; but not limited to, all correspondences with the SLPS up until that date.

The Plaintiff has lost irreplaceable time away from his daughter, and the Plaintiffs mother, brother and sister have been encouraged not to, and/or afraid to communicate with him.  The Plaintiff has also been "indirectly" advised to stay away from the health club he works out at as a result of surveillance related actions of investigative personal.  Please help the Plaintiff justifiably, reasonably, and safely.